**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____ )
                                          )  **VERIFIED COMPLAINT FOR**
RYAN J. STRASSER,                         )  **DAMAGES AND**
2121 Grove Ave. #2                        )  **INJUNCTIVE AND**
Richmond, VA 23220,                       )  **DECLARATORY RELIEF**
                                          )
                     Plaintiff,           )
                                          )
              v.                          )  Civ. No. _____
                                          )
SARAH JONES DICKENS,                      )
715 Stansbury Road,                       )  Jury Trial Demanded
Littleton, NC 27850                       )
                                          )
                     Defendant.           )
_____ )

**VERIFIED COMPLAINT**

Plaintiff Ryan J. Strasser, for his verified complaint against Defendant Sarah Jones

Dickens, states and alleges the following:

**INTRODUCTION**

Plaintiff Ryan J. Strasser ("Mr. Strasser") and Defendant Sarah Jones Dickens

("Defendant") lived together for more than two years, during which Mr. Strasser assumed the

responsibilities of a sole breadwinner.  After roughly a year together, in anticipation of marriage,

Mr. Strasser purchased a 4.06-carat, $100,000+ diamond engagement ring, which he offered to

Defendant with his proposal of marriage.  Defendant accepted the ring and the marriage proposal

upon which the offer of the ring was predicated.  Roughly eleven months later, the parties'

marriage plans collapsed with a highly contentious break up that ended their engagement.

Although Mr. Strasser was the sole lessee of their communal home in Washington, D.C., he

vacated the premises but continued to pay rent for her occupancy.  Following repeated requests

and months of negotiation during which Mr. Strasser sought to retrieve his belongings, Defendant

finally agreed to return most but certainly not all of Mr. Strasser's property remaining at the home

she continued to occupy.  However, she refused to return Mr. Strasser's conditional gift of the

engagement ring, as well as electronic equipment.  While she ultimately abandoned the leasehold

estate without informing Mr. Strasser (and left conditions that Mr. Strasser, as lessee, had to pay to

clean up or repair), she apparently retained possession of his ring and his electronics.  After

repeated unsuccessful entreaties to her counsel to arrange for the return of these items, Mr.

Strasser was left with no choice but to file this action for the return of his belongings and for

injury to his leasehold tenancy caused by Defendant.

## PARTIES

1.      Mr. Strasser is a resident of the Commonwealth of Virginia, residing therein at

2121 Grove Ave., #2, Richmond, Virginia, 23220.

2.      Upon information and belief, Defendant has resettled to the state of North Carolina

and is domiciled therein at 715 Stansbury Road, Littleton, North Carolina, 27850.

## JURISDICTION

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) as

the parties are diverse and the amount in controversy exceeds $75,000.

4.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(1).  Mr.

Strasser and Defendant resided at 6520 Barnaby Street, NW, Washington, DC, 20015, from July

21, 2016 until the parties terminated their relationship on January 8, 2018, and the facts giving rise

to the claims alleged herein occurred within this District.  Defendant, having resided in the district

throughout the engagement and beyond, has sustained sufficient contacts with the District, and it is reasonably foreseeable that she will be held accountable for her actions in this District.

## FACTUAL BACKGROUND

### *The Relationship's Formation*

5.      Mr. Strasser and Defendant (the "Parties") met as college classmates at Duke University in approximately 2004.  Despite taking different paths after college—Mr. Strasser earned a law degree and a Master of Public Administration, whereas Defendant studied art history in Cambodia and later enrolled in a Ph.D. program at Duke University—the parties enjoyed a friendly relationship for many years and eventually began dating in early November of 2015.

6.      At the time that the parties began dating, Mr. Strasser was residing in Arlington, Virginia at a one-bedroom condominium unit he had purchased in June 2013 (the "Westview") and was associated with a prominent D.C. law firm.  Defendant resided with her parents in Littleton, North Carolina and was pursuing her Ph.D degree from Duke University.

### *The Parties' Co-Residency at the Westview*

7.      On December 4, 2015, Defendant drove to visit Mr. Strasser at the Westview after conducting research in New England for her Ph.D. dissertation.  As she approached the Westview, Defendant's car was struck by a vehicle in a hit-and-run.  Defendant's car sustained significant damage and was taken to a vehicle repair shop.  In light of their new relationship and Defendant's inability to drive back to North Carolina following the weekend, Mr. Strasser permitted Defendant to stay in his Westview condominium unit until her car could be repaired.  The parties decided at that time to commit to an exclusive romantic relationship.

8.      The repair shop required several weeks to repair Defendant's vehicle and thus she stayed at Mr. Strasser's apartment for approximately three weeks.  At Christmas, both parties

returned to their respective families' homes.  By December 27, 2015, however, the parties had returned to Arlington, and Defendant effectively moved in full time to Mr. Strasser's one-bedroom condominium.

9.      Defendant did not contribute to the mortgage or expenses.  Mr. Strasser operated as the parties' sole breadwinner from the beginning to the end of their cohabitation.  Defendant during this time period was not employed in either a full-time or part-time capacity and thus had no income.  She previously received stipends of several thousand dollars each semester from Duke University; however, in approximately May 2016, Duke University informed her that she would not receive any stipends for the summer or the forthcoming summer or semesters.

10.      Mr. Strasser had adopted two rescue dogs, who lived in the unit with him prior to the Parties' relationship and Defendant brought a dog of her own that she had prior to the relationship to live in the Westview as well.  Over the next several months, the living space available in the unit proved difficult for the Parties and the three dogs.

11.      In addition, following her move in, Defendant insisted that Mr. Strasser needed to refurnish his apartment.  Mr. Strasser paid for virtually all of this furniture, save a piece or two of minor furniture gifted to the Parties by Defendant's parents.  Nevertheless, Defendant did not make financial contributions toward these purchases.

12.      In early spring 2016, Defendant requested that Mr. Strasser consider moving the Parties and their pets into a larger, more spacious residence, and either sell or rent the Westview. Mr. Strasser was initially reluctant but succumbed to considering an alternative residency at Defendant's repeated behest.  Accordingly, Defendant conducted significant research and identified a number of homes that the Parties viewed, usually together.

13.     Eventually, Defendant brought to Mr. Strasser's attention a home available for rent

in the Chevy Chase neighborhood of Washington, DC, located at 6520 Barnaby Street, NW,

Washington, DC, 20015 (the "Barnaby Property").  Mr. Strasser submitted an application and was

accepted.  In June 2016, Mr. Strasser executed a lease agreement in which he agreed to rent the

Barnaby Property at a rate of $4,800.00 per month for 24 months, from July 21, 2016 through July

20, 2018.  The lease only listed Ryan Strasser as a "Lessee" but did list Sarah Jones Dickens as a

"Permitted Occupant."  To obtain this lease, Mr. Strasser provided a security deposit of $4,800, or

one month's rent.

14.     The Parties moved out of the Westview on July 21, 2016.  During the period in

which Defendant lived with Mr. Strasser at the Westview, from December 4, 2015, through July

21, 2016, Mr. Strasser alone paid the mortgage, the housing association fees, all utilities, and all

living expenses for both Parties.  Defendant made no financial contributions to the Parties' shared

cohabitation.

### *The Parties' Residence at the Barnaby Property & Search for an Engagement Ring*

15.     The Parties moved into the Barnaby Property.  The financial burdens of the parties

remained the same: Mr. Strasser continued to pay all rent, all utilities, and for all living expenses.

This continued for the roughly year and a half that the Parties cohabitated at the Washington, D.C.

property, and persisted even after Mr. Strasser had moved out.

16.     In the months that followed, Defendant demanded that Mr. Strasser make

numerous purchases to furnish the five-bedroom house, which Mr. Strasser reluctantly did most of

the time.  On several occasions when Mr. Strasser would not make such purchases, Defendant

would use Mr. Strasser's credit cards to purchase those items and others for the home.  Although

Mr. Strasser had on occasion previously permitted Defendant to use his credit cards to purchase

certain items, Defendant construed such consent as unfettered and boundless, such that she could make such purchases without Mr. Strasser's express consent or over Mr. Strasser's objections. Mr. Strasser vocalized his displeasure with Defendant's actions and repeatedly counseled her not to abuse his credit cards or to use them on items the Parties had not discussed.

17.     Within months of commencing their relationship, Defendant notified Mr. Strasser that she expected Mr. Strasser to propose to her with an engagement ring within one year of the start of their relationship.  Defendant noted that she felt an urgency to wed and refused to wait longer than one year for an engagement.

18.     In the Fall of 2016, Defendant requested that the Parties begin to look for an engagement ring together.  Defendant insisted that she deserved a "large" engagement ring because she did not believe in "wasting" money on a wedding and so the Parties should instead spend "extra" on an engagement ring, something she would enjoy daily for the rest of her married life.

19.     The Parties had some preliminary discussion about the parameters of an engagement ring that Mr. Strasser would eventually buy for the purpose of proposing to Defendant.  Mr. Strasser indicated that he was willing to purchase a diamond of approximately 4 carats and had contemplated a budget of approximately $40,000.  Defendant stated that whatever she would eventually want likely would cost more than that.

20.     Following multiple trips to various jewelers, Defendant declared that she had to have an engagement ring of about 3.5 to 5 carats with an inclusion rating of no "worse" than VS2 and a color rating of no "worse" than G, ratings regarding the quality of the diamond in question. She also advised that her diamond could have no florescence.  Defendant further determined that she wanted an Old European Cut diamond, a type of diamond cut using a manufacturing process

in the early part of the 1900s that has since fallen out of fashion due to improved diamond-cutting technology and due to the diamond industry's marketing of more modern cuts as having superior "sparkle." Diamonds that fit all of these criteria far exceeded Mr. Strasser's contemplated $40,000 budget.

### The Betteridge Diamond Engagement Ring

21.     On Sunday, December 18, 2016, Defendant brought to Mr. Strasser's attention via e-mail a diamond engagement ring that she recently located on-line at a reputable jewelry store in Greenwich, Connecticut, called Betteridge. Mr. Strasser first reviewed this option on a website containing pictures of the "diamond engagement ring" and described its features. True and correct copies of that webpage, which remains active as of September 14, 2018, are attached hereto as Exhibits 1(a), 1(b), and 1(c). The diamond engagement ring that piqued Defendant's interest contained a primary 4.06 carat, G-colored, VS2 diamond, designated as an Old European Cut on its GIA report, with smaller, baguette diamonds along a platinum band ("Engagement Ring"). *See* Ex. 1(c). At the time the webpage listed the price for this ring at approximately $119,000. A true and correct copy of a receipt reflecting this initial list price is attached hereto as Exhibit 2.

22.     Although he repeatedly told Defendant that the price far exceeded his budget, Mr. Strasser eventually acceded and undertook to negotiate for the ring. Upon contacting the store, Mr. Strasser reached Win Betteridge, the son of the owner of the store and its Chief Financial Officer. Mr. Betteridge informed Plaintiff that he was willing to discount the ring and sell it at a reduced price of $99,800. *See* Ex. 2. Mr. Strasser requested that Mr. Betteridge pull the ring from the showroom and set it aside for the Parties to inspect in person. Mr. Strasser agreed to take off

from work on Monday, December 19, 2016, to travel with Defendant to Greenwich, Connecticut, to inspect and consider the Engagement Ring in person.

23.     At the store the Parties met with Mr. Betteridge.  Ultimately, Mr. Strasser determined that the ring was right for his presumptive future wife and that he would purchase the ring.  First, however, Defendant wished to have the Engagement Ring and diamond regraded by the GIA because the then-operative GIA report was dated January 9, 2012, and she wanted assurance that the diamond had not sustained any damage since that 2012 GIA report.

24.     At Defendant's behest, Mr. Strasser contacted Mr. Betteridge on or about December 19, 2016.  Mr. Betteridge agreed to have the diamond recertified in light of the intervening time period to ensure the diamond had not suffered any damage since the prior grading report on January 9, 2012.  He advised he could likely expedite the process given his relationship with the GIA.  Mr. Strasser made no payment at the time.

25.     On December 21, 2016, the GIA completed its regrading of the Engagement Ring and issued a new report.  A true and correct copy of the December 21, 2016 GIA Report is attached hereto as Exhibit 3.  Mr. Betteridge e-mailed it to Mr. Strasser as soon as he received it. On that same day, Mr. Strasser made his first payment of $10,000.00.  He then made four payments of $20,000.00, one on January 10, 2017; one on January 12, 2017; one on January 14, 2017; and one on January 24, 2017.  He made two final payment on January 26, 2017, one for $3,800.00 on one credit card and one for $6,000.00 on a second credit card.  To help make all of the payments, Mr. Strasser took out a $30,000 personal loan through SoFi at an interest rate of 5.95% per annum.  Since February 2, 2017, Mr. Strasser has made monthly installment payments of $912.71, and he is obligated to continue making such monthly payments through January 1, 2020.

26.     On January 3, 2017, an in-house appraiser at Betteridge prepared an appraisal of

the Engagement Ring, which asserted,

> We have this day appraised, for retail replacement value, the following article **which is the property of:**
>
> **Ryan Strasser**
> 6520 Barnaby Street Northwest
> Washington, DC 20015
>
> Platinum and diamond ring set with one 4.06 ct near-colorless very slightly included old European-cut diamond measuring 10.14 to 10.26 by 6.16 mm (GIA grade G-VS 2, report number 2145290277) in a four-prong mounting, with shoulders set with 14 near-colorless very slightly to very very slightly included round brilliant-cut diamonds weighing .20 ct in total, marked "AEB" for Albert E. Betteridge
>
> $119,000
>
> By:
>
> /s/ Alexia S. Palmer
> Alexia S. Palmer, G.G.
>
> BETTERIDGE JEWELERS, INC.

(emphasis added).  A true and correct copy of this appraisal is attached hereto as Exhibit 4.

27.     On or about January 4, 2017, Mr. Strasser reached out to John Underwood of

Nationwide Insurance Company ("Nationwide") to insure the Engagement Ring.  Mr.

Underwood was able to write the policy, and it went into effect on or about January 6, 2017.

Nationwide charged an annual premium in the amount of $1,051 for the Engagement Ring.

Installment payments of approximately $87.58 are automatically deducted monthly from Mr.

Strasser's bank account.  Mr. Strasser continues to pay for the full insurance on the

Engagement Ring.

28.     On February 8, 2017, the Parties had the Engagement Ring re-reviewed by an

independent appraiser, Martin Fuller Appraisals, LLC ("Martin Fuller").  On February 18,

2018, Martin Fuller e-mailed Mr. Strasser a copy of his full independent appraisal report. That report contained an appraisal value of $122,550.00.  A true and correct copy of the Martin Fuller appraisal value page is attached hereto as Exhibit 5.

### *The Engagement*

29.     On or about January 26, 2017, the Parties received a shipment from Betteridge containing the Engagement Ring; title to the Engagement Ring; the original December 21, 2016 GIA Report; and a final Bill of Sale.

30.     On February 9, 2017, Mr. Strasser asked Defendant to marry him.  Mr. Strasser assumed the traditional proposal position on one knee, extending the engagement ring box and opening it, while asking Defendant if she would marry him.  Defendant accepted Mr. Strasser's proposal and the Engagement Ring and agreed to marriage, and with that Mr. Strasser placed the Engagement Ring on the fourth finger of Defendant's left hand, traditionally referred to as the ring finger.  Mr. Strasser proposed in a public location with a professional photographer present to document Mr. Strasser asking Defendant to marry him. The photographer witnessed Defendant accept Mr. Strasser's proposal and witnessed Mr. Strasser slip the ring on Defendant's ring finger as soon as Defendant agreed to the marriage proposal.  In addition, the proposal took place in a public location, and the Parties had many strangers, who had witnessed the event from afar, congratulate them shortly thereafter.  The Parties also called both sets of parents that evening to inform them that they had become engaged.  The Parties informed friends and other family members by text message sporadically over the next several days.

31.     Shortly after the proposal, Defendant began discussing a wedding.  In fact, one of the strangers who congratulated the Parties on their engagement was a wedding

planner whose card Defendant requested upon learning of the woman's occupation.

Defendant reached out to that wedding planner several weeks later to inquire about pricing,

logistics, and next steps.  In addition, Defendant reached out to several venues about the

possibility of hosting a small wedding for the Parties.  For instance, on March 12, 2017,

Defendant contacted the Park Hyatt in Beaver Creek, Colorado, to inquire about whether it

could accommodate a wedding of 30-40 people on January 27, 2018.  A true and correct

copy of Defendant's e-mail correspondence with the Park Hyatt in Beaver Creek is attached

hereto as Exhibit 6.  Mr. Strasser also contacted Ted Steers of Vail Village Rentals—at

Defendant's behest and with Defendant physically beside him—to inquire about the

possibility of renting a ski chalet for the purposes of hosting a wedding from approximately

January 25-29, 2018.  A true and correct copy of Defendant's subsequent correspondence

with Ted Steers is attached hereto as Exhibit 7.

32.     Defendant also began creating a wedding registry for the Parties shortly after

their engagement.  Although it was recently removed, the registry the Defendant created

listed a "wedding registry" for "Ryan Strasser & Sarah Jones Dickens" and identified a

wedding date of January 27, 2018.  True and correct copies of screenshots capturing how the

website appeared publicly as of January 30, 2018 are attached hereto as Exhibits 8, 9, and 10.

33.     On August 28, 2017, Defendant posted on her Facebook Page a series of

twelve engagement photographs taken by Jeffrey Hulse that the Parties had not previously

publicly displayed.  She included a caption that characterized the photos as follows: "A few

engagement photos taken from February 2017 . . . ."  Several of these photographs show

Defendant wearing the Engagement Ring on her ring finger.  Those photographs received

hundreds of "likes" from the Parties' friends and family members, dozens of which offered

"congratulations" to the Parties on their engagement.  True and correct copies of examples of

Defendant's posts are attached hereto as Exhibits 11 and 12.  At some point in time,

Defendant also changed her Facebook "relationship status" to "Engaged."

34.     After determining that many of their preferred venues already were booked

for more than a year in advance, the Parties took a hiatus from wedding planning.

Additionally, Defendant began focusing again on writing her Ph.D. dissertation and

immersed herself in research and writing.  Defendant decided that she preferred to wait for

wedding planning until after she finished her dissertation in spring 2018.  The Parties agreed

on a prolonged engagement to facilitate her graduation and expected to turn back to wedding

planning after her expected May 2018 commencement.

### The End of the Relationship

35.     Eventually, the Parties' relationship soured and grew especially tumultuous in

December 2017.  After a particularly dramatic weekend, on Sunday, January 7, 2018, Defendant

placed a phone call around 8:30 PM to Mr. Strasser's parents, Sharon and Joseph Strasser, who

reside in New Jersey.  Defendant informed Mr. Strasser's parents that Mr. Strasser would "not

stop crying" and Defendant informed Joseph Strasser that she was unhappy with the relationship

and ordered Joseph Strasser to "come get [Mr. Strasser] out of the house."  Joseph Strasser

objected that because Mr. Strasser pays all the rent, is the only lessee, pays all the utilities, and

pays all the living expenses, Defendant should be the one to leave the house.  Defendant refused

to leave, and Mr. Strasser's parents decided to drive down to Washington, DC, that evening to be

with Mr. Strasser.  Mr. Strasser left the Barnaby Property and met his parents at a nearby hotel,

where they rented a room for the night.  He confirmed that the engagement was over.

36.     The next morning, on January 8, 2018, Mr. Strasser and his parents went back to the Barnaby Property so that Mr. Strasser could retrieve certain items he needed for work.  At the home Mr. Strasser confronted Defendant and demanded that she return the engagement ring. Defendant refused.  Mr. Strasser again, in the presence of his parents, demanded that Defendant hand over the Engagement Ring.  Defendant again refused and stated that she intended to keep it until she "completed her dissertation and moved all of her property out of" the Barnaby Property.

37.     Mr. Strasser and his parents left the house, and Mr. Strasser went off to work.  Mr. Strasser's parents subsequently returned to the Barnaby Property without Mr. Strasser in order to retrieve Mr. Strasser's two dogs.

38.     Around the time that they returned to the Barnaby Property, Mr. Strasser's parents discovered that Defendant's father Samuel Dickens had arrived at the Barnaby Property.  Joseph Strasser and Samuel Dickens had lengthy discussions about how the Parties could begin to untangle the living arrangement in the most amicable way possible.  Mr. Strasser returned to the Barnaby Property in the early afternoon after his office closed early due to inclement weather. After returning home, Mr. Strasser engaged in similar discussions with Defendant and her father. During one such conversation directly with Defendant, Mr. Strasser requested the Engagement Ring so that they could both part peacefully.  Defendant once again refused to return it to him.

39.     Mr. Strasser indicated to Defendant and her father that he appreciated Defendant's desire to remain in the home until she finished her dissertation in approximately April 2018 and stated that he was amenable to that arrangement on the condition that she produce the Engagement Ring.  Mr. Strasser explained that in light of the Parties' engagement ending, Mr. Strasser desired to return or to sell the Engagement Ring in order to pay off his personal loan with SoFi that enabled him to pay for the engagement ring and so that he could cancel the monthly

Engagement Ring insurance with Nationwide.  Mr. Strasser further explained that he could not

financially afford to pay for Defendant to live in the Barnaby Property at $4,800.00 per month

plus its utilities, in addition to having to pay for a new residence and utilities for himself, with the

weight of the monthly Engagement Ring payment of $912.71 per month and the $87.58 per

month insurance.

40.     Initially, Defendant's father expressed a modicum of sympathy for Mr. Strasser's

position.  He indicated, however, that he could not return the Engagement Ring to Defendant

because Defendant then would have no "leverage" to prevent Mr. Strasser from evicting

Defendant from the Barnaby Residence, given that she was not on the lease.  Mr. Strasser asked

Defendant's father whether Defendant would consent (1) to returning the Engagement Ring on a

date certain following Defendant's completion of her dissertation; (2) to paying some portion of

the monthly Barnaby Property rent; and (3) to putting the parties' understanding concerning these

matters in writing in the form of a signed contract, in exchange for Mr. Strasser vacating the

Barnaby Property and allowing Defendant to remain there with Mr. Strasser continuing to pay the

rent.  Defendant's father unequivocally agreed to that arrangement.

41.     Both Parties, Mr. Strasser's parents, and Defendant's father relaxed after this deal

had been struck.  Indeed, Joseph Strasser returned to New Jersey in reliance on the representation

that the Parties had reached an agreement.  Several hours later, however, Defendant retreated to

the master bedroom alone to speak with Teenie Dickens, her mother.  After approximately 30

minutes, Defendant reappeared and abruptly proclaimed that she had changed her mind, that in

her and her Mother's view the Engagement Ring "belonged to her" forever, that she would "never

give it back," that the "deal was off," and that she was not leaving the Barnaby Property under any

circumstances until her dissertation was complete.  Defendant's father was audibly and visibly

frustrated but announced he refused further involvement in the matter.

42.      This moment ended the conversation, and the Parties retreated to their separate

rooms.  Mr. Strasser memorialized the events of the day in a letter that he authored and sent to

Defendant later that evening, which *inter alia* requested that she vacate the premises, requested

that she provide a departure date by which she could remove all of her personal property, and

requested once more that she return the Engagement Ring.  A true and correct copy of this letter is

attached hereto as Exhibit 13.  Mr. Strasser's thorough e-mail never received a response.

43.      Deciding that it was not a prudent living arrangement for the Parties to remain

under the same roof, Mr. Strasser left and took up refuge the next day at a hotel with Sharon

Strasser until Defendant could gather her belongings and depart.  However, Defendant refused to

depart.  She remained in complete possession of the premises and all chattel on the premises,

including Mr. Strasser's; refused to pay for rent or utilities; and repeatedly denied Mr. Strasser

access to any of his personal property, including prescription immunology medication not easily

replaceable and that was subsequently ruined as a result of its non-timely return.  Mr. Strasser left

the Barnaby Property with only the few articles of clothing he could quickly carry out of the house

on January 9, 2018, and nothing more.

### *Further Attempts to Retrieve Mr. Strasser's Property*

44.      Several weeks later, Mr. Strasser relocated permanently to Richmond, Virginia.  In

the ensuing months, however, Mr. Strasser repeatedly requested through counsel that Defendant

grant Mr. Strasser access to the house to retrieve certain core personal items, such as his work

wardrobe, shoes, casual clothes, and his two personal laptop computers and iPad.  Mr. Strasser

also sought access to his strong box, which included critical documents including his passport,

birth certificate, social security card, title to the Westview condo, loan documents for the Westview condo, and title to Mr. Strasser's 2011 Chevrolet Camaro automobile, as well as gold and silver coins valued at approximately $4,400.00.  And Mr. Strasser also sought and was denied access to the house to retrieve numerous personal property items for which he solely paid, before and during the relationship, and to which he has sole title.

45.      After weeks of requests to retrieve Mr. Strasser's things submitted through counsel to Defendant being ignored, Defendant, through counsel, granted Mr. Strasser entry onto the premises—the house where Mr. Strasser still was the sole lessee and sole payor of rent.  On March 3, 2018, Mr. Strasser was permitted access but *solely* to the house's garage.  Mr. Strasser was able to retrieve many of his personal effects, but not all.  He was not able to retrieve items such as his strongbox, any furniture, or other larger items.  Mr. Strasser's electronics also largely were absent from the garage.  Most importantly, the Engagement Ring still was not returned. Defendant was in the house at the time of retrieval, but Mr. Strasser, accompanied by counsel throughout the retrieval, made no attempt whatsoever to interface or converse with Defendant.

46.      Mr. Strasser noted and inventoried the additional items that he wished to retrieve. Mr. Strasser's counsel made multiple attempts to arrange another pickup, but such attempts were thwarted by Defendant's counsel, who rather than trying to resolve the situation, threatened Mr. Strasser with legal action.  Defendant's counsel later ignored multiple letters requesting a second entry to retrieve Mr. Strasser's remaining possessions.

47.      On May 20, 2018, having previously requested that Defendant leave the premises before that date, and after a friend had driven by the Barnaby Street house and observed that it appeared to have been abandoned by Defendant, Mr. Strasser and a friend reentered the house. There was no sign of Defendant, and she clearly had moved out of the house many weeks prior.

The house smelled terrible due to the refrigerator having been turned off and rancid meat having seeped out.  A true and correct copy of a photograph of the refrigerator has been attached as Exhibit 14.  There were also angry writings on the walls of the house in pen and permanent marker.

48.     Mr. Strasser was able to retrieve most of his remaining belongings, and most of the furniture that was his had been left in the house.  However, Mr. Strasser's electronics, including two computers, an ipad, an ipod, a Bluetooth speaker, and various other items were missing.  There was no sign of the Engagement Ring—Defendant never returned it.  A full and complete inventory of items belonging to Mr. Strasser that have not been rightfully returned to him is attached hereto as Exhibit 15.

49.     On August 19, 2018, after Mr. Strasser had arranged to be released from his lease and after all remaining belongings left in the house by Defendant had been removed, the owners of the Barnaby Property informed Mr. Strasser that they would not provide Mr. Strasser with the full balance of his security deposit but instead would keep $3,800 of the deposit to pay for necessary repairs to the house (returning $1,000 to Mr. Strasser despite claiming more than $5,000 in damages).  Chief among the reasons for withholding the security deposit were the need to replace the refrigerator due to Defendant's neglect and the need to replace a window in the attic that Defendant had left open, leading to rotting from rain damage.  A true and correct copy of the e-mail explaining the owners' decision to withhold the security deposit is attached as Exhibit 16.

## COUNT ONE:
## REPLEVIN FOR WRONGFULLY POSSESSED ENGAGEMENT RING

50.     Mr. Strasser realleges and incorporates herein by reference the allegations of numbered paragraphs 1-49 of this Verified Complaint.

51.     When Mr. Strasser offered the Engagement Ring to Defendant on February 9, 2017, Mr. Strasser did so as part of a proposal that Defendant marry him.  Mr. Strasser therefore conditioned the gift of the Engagement Ring on a subsequent condition—a marriage—taking place.

52.     Under D.C. law, the giving of an engagement ring as part of a proposal to marry is a conditional gift, whereby title to the Engagement Ring reverts to the donor if a wedding fails to occur due to a broken engagement.  *See Singer v. Singer*, 636 A.2d 422, 422, n.3 (D.C. 1994). D.C. courts also look to Maryland law, "the most authoritative body of law other than" D.C.'s own precedent.  *In re CAP*, 633 A.2d 787 (D.C. 1993).  Maryland law provides that an engagement ring is a conditional gift that must be returned to the donor if a marriage fails to occur subsequently.  *In re Stoltz,* 283 B.R. 842 (B.R. Md. 2002) ("[T]he right of a disappointed fiancé to recover possession of an engagement ring given in contemplation of marriage survives because ***Maryland recognizes the right of a donor to recover a conditional gift***.") (citing *Grossman v. Greenstein*, 161 Md. 71 (1931) (emphasis added)); *see also Ver Brycke v. Ver Brycke*, 379 Md. 669 (2004), *reconsid. denied* ("Although this is the general rule, in limited instances, '[a] donor may limit a gift to a particular purpose, and render it so conditioned and dependent upon an expected state of facts that, failing that state of facts, the gift should fail with it'").

53.     When the Parties ended their relationship and thus broke their engagement, the condition to the offer of the Engagement Ring failed because no marriage will take place.

54.     Once the condition of a marriage occurring failed, full legal and equitable title to the Engagement Ring reverted to Mr. Strasser, the donor.  Accordingly, the Engagement Ring is Mr. Strasser's chattel.

55.     Because Defendant refuses to deliver the Engagement Ring to Mr. Strasser despite multiple demands, Defendant has wrongfully taken and detained Mr. Strasser's chattel.

56.     Under D.C. law, if a party has wrongfully or unjustly taken or detained the chattels of another, the true owner is entitled to have those chattels taken and delivered to him by court order.  D.C. Code § 16-3701-02.

57.     All remedies available to a party at state law are available to a party in federal court to secure the satisfaction of a potential judgment.  Fed. R. Civ. P. 64(a).  D.C. law specifically allows for the return of property via replevin.  *See* D.C. Code § 16-3-3701-02 *et seq.*

58.     Replevin also is specifically allowed by the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 64(b).

59.     Defendant's conduct is willful and malicious.  Defendant's wrongful action is ongoing and continuous.  Therefore, Mr. Strasser is entitled to a writ of replevin and to the immediate delivery of the Engagement Ring to Mr. Strasser.

**COUNT TWO:**
**REPLEVIN FOR KNOWN CHATTELS**
**OF WHICH DEFENDANT HAS DEPRIVED PLAINTIFF**

60.     Mr. Strasser realleges and incorporates herein by reference the allegations of numbered paragraphs 1-49 of this Verified Complaint.

61.     Mr. Strasser repeatedly has requested the return and the opportunity to retrieve his personal property ("Known Chattels") described in the inventory attached as Exhibit 15, but Defendant has failed and refused to return such property.

62.     Thus, Defendant wrongfully and unjustly has taken Mr. Strasser's Known Chattels.

63.     Therefore, Mr. Strasser is entitled under Rule 64 of the Federal Rules of Civil

Procedure and Rule 64-II of the Superior Court Civil Rules to a writ of replevin and to the

delivery of the Known Chattels to Plaintiff.

## COUNT THREE:
## CONVERSION OF THE WRONGFULLY POSSESSED
## RING AND KNOWN CHATTELS

64.     Mr. Strasser realleges and incorporates herein by reference the allegations of

numbered paragraphs 1-49 of this Verified Complaint.

65.     Under D.C. law, conversion consists of "an unlawful exercise of ownership,

dominion, and control over the personal property of another in denial of his right to such

property." *Baltimore v. District of Columbia*, 10 A.3d 1141, 1155 (D.C. 2011).

66.     Mr. Strasser has a right to the Engagement Ring that he provided to Defendant as

a conditional gift as explained in numbered paragraphs 51–54 and as incorporated herein.

67.     Mr. Strasser has a right to his Known Chattels.

68.     In the alternative, Defendant has sold or otherwise disposed of the ring

committing a tortious act of conversion.

69.     In the alternative, Defendant has sold or otherwise disposed of the known chattels

committing a tortious act of conversion.

70.     Mr. Strasser is entitled to damages for any and all of Defendant's acts of

conversion.

## COUNT FOUR:
## DAMAGE TO PLAINTIFF'S LEASEHOLD

71.     Mr. Strasser realleges and incorporates herein by reference the allegations of

numbered paragraphs 1-49 of this Verified Complaint.

72.     In order to secure a leasehold on the Barnaby Property, Mr. Strasser provided a $4,800 security deposit to the lessors.

73.     Defendant caused property damage in excess of $5,000 to the Barnaby Property. This damage included writings on the interior walls of the premises, leaving rotten and spoiled meat in the refrigerator after she abandoned her occupancy without notifying Mr. Strasser, allowing an attic window and frame to rot by leaving it open and susceptible to rain damage, and necessitating the rekeying of the house and mailbox.

74.     Upon information and belief, Defendant's actions in causing the foregoing damage to the leasehold and preventing mitigation by abandoning the leasehold without notice to Mr. Strasser were willful and intended to cause harm to Mr. Strasser.

75.     As a direct and proximate result of Defendant's actions, Mr. Strasser lost the sum of $3,800 of the security deposit used to secure the leasehold.

76.     Mr. Strasser is entitled to reimbursement from Defendant for the sum of $3,800 for damage caused by and during her exclusive occupancy, plus interest, to account for loss of this portion of his security deposit.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ryan J. Strasser respectfully requests that judgment be entered against Defendant as follows:

(a)     Declaring Plaintiff to be the sole owner of the Engagement Ring;

(b)     Issuing a writ of replevin directing Defendant to deliver the Engagement Ring to Plaintiff;

(c)     Issuing a writ of replevin directing Defendant to deliver the Known Chattels to Plaintiff;

(d)     In the alternative, requiring the Defendant to pay damages for the Engagement

Ring or any Known Chattels that have been sold or otherwise disposed of.

(e)     Awarding Ryan Strasser the sum of $3,800, plus interest, to damage to the

leasehold during Defendant's exclusive occupancy, resulting in the loss of that portion of his

security deposit.

(f)     Awarding reasonable attorneys' fees and costs under D.C. Code § 2-1403.13 and

42 U.S.C. § 12205; and

(g)     Awarding all other and further relief as this court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury as to all issues in this case triable of right to a jury.

DATED:          September 24, 2018                    Respectfully submitted,

                                                      **SHEPPARD, MULLIN, RICHTER &**
                                                      **HAMPTON LLP**
                                                      By: /s/ Steven P. Hollman
                                                          Steven P. Hollman
                                                             (DC Bar No. 375658)

                                                      Steven P. Hollman
                                                      James N. Bierman, Jr.
                                                      2099 Pennsylvania Ave., Suite 100
                                                      Washington, D.C. 20006
                                                      Telephone: (202) 747-1931
                                                      Facsimile:  (202) 747-3817
                                                      shollman@sheppardmullin.com
                                                      jbierman@sheppardmullin.com

                                                      *Counsel for Plaintiff Ryan J. Strasser*

## **VERIFICATION**

The undersigned hereby states and alleges upon his personal knowledge that the facts set forth in the accompanying Verified Complaint are true and correct.

I hereby verify under the penalties of perjury under the laws of the United States of America that the facts set forth herein are true and correct.

Executed this 24 day of September, 2018.

Ryan J. Strasser